Good morning, Your Honors. May it please the Court, my name is Richard Heston. I am here to argue today on behalf of my client, Matthew Ashworth, who has… Mr. Heston, would you keep your voice up, please? Yes, sir. You have a very soft voice. I'm here today to speak to the Court and argue on behalf of my client, Matthew Ashworth. Mr. Ashworth is an individual who has now completed a five-year Chapter 13 plan, with his final payment being made in January of 2016. The plan has been fully funded. What remains to be determined by this Court is whether or not the claim of the former spouse has been paid. I checked with the website of the courts this morning to determine, and what I learned was that the total amount that's been paid by my client into this plan over the last five years is $68,441. However, the claim of Ms. Ehrgott, his former wife, has been paid by wage garnishment outside the plan to the tune of $90,000 during that very same period. What makes Mr. Ashworth's situation unique is that after a five-and-a-half-year marriage, he ended up with an obligation folded together out of two separate lawsuits that gave rise to an obligation labeled to be spousal support and pursuant to which he has the obligation to pay 17 years of alimony, as is characterized by the State of Tennessee, to a woman who has been married for all but 10 months following the divorce. We have maintained throughout that the folding together of two claims is what makes this case quite unique and distinguishable from simply another attack on a spousal support obligation. While I'm sure the Court is well familiar with the facts of the record, I'd like to just highlight that what we have here is an individual that, without dispute, failed to maintain his marital vows of fidelity, entered into a brief sexual encounter that left him... I'm not looking to enter into a moral judgment. I'm just not sure why a bankruptcy court or a federal court generally should get involved in a realignment of obligations that were worked out in a Tennessee, I don't know what they called it, their family court. Why do we want to stick our nose into that tent? I mean, your client can, and I think did, seek to get a realignment from the Tennessee court, and that's not what Tennessee was interested in giving him. Why come to us? Because the bankruptcy court is a bank, is a court of equity that is there to make certain that the treatment of all creditors is fair and equitable. But there's no other creditor here saying, I've been screwed because of this. It's your client that's the moving force here. That may be true, but there are other creditors with lesser claims who have been paid absolutely nothing through this plan and will receive absolutely nothing through this plan, because in effect, all of the oxygen was sucked out of the room by one claim, which, by the two parties' actions, was created, if you want to say, out of the fabric of two lawsuits. First, we have a divorce case of a relatively short marriage that should not have given rise to a lengthy obligation at all. However, there was a $10 million lawsuit filed by the claimant, Ms. Ergot, seeking damages because she contracted herpes simplex 1. As a result of that settlement, we have these two claims merged together. Suddenly, the $10 million claim becomes a $1 claim and such other further consideration as contained in the divorce decree. And that was the deal that was done? It was a deal that was done, and it's not uncommon for family law litigants to cobble together settlements that will maximize resources for the two of them so as to facilitate settlement. But when they do so at the expense of other creditors, that's where the Bankruptcy Court has its principles that all creditors are to be treated fair and equitably, and a creditor cannot buy this kind of an arrangement. Who would be the principal beneficiary if your arguments prevailed? The other creditors, the credit card companies, those that were not paid. Your client who sheds an obligation for years to come? I'm sorry, I didn't hear you. Your client? Wouldn't he be shedding an obligation for years to come? That is true. He would also benefit. That's what strikes me as the motivation behind this, and one of the reasons why we shouldn't encourage people to try a second bite by coming to Bankruptcy Court. Well, I think that a very, this case is... Tell me why we should. I mean, that's really, I've tried to put it down on the table. I just don't know why Federal law, by Bankruptcy Court, should be encouraged to redo what starts out at least as a family court obligation. Because the Bankruptcy Court has the higher duty to make certain that fairness prevails and that if the parties in a conference room and in an attorney's office take two lawsuits and meld them together and label it as support, and by doing so, essentially ensure that all of the resources available to the payor will be directed, no matter that he might file bankruptcy, 100% of those resources will be directed to the payment of that claim. And there has been a change in the law. We have a rule in the Ninth Circuit that we have to follow our cases unless we're in bank. I'd like you to concentrate on this issue. Tell us why we should not follow Friedkin v. Sternberg as to the four factors and evidence that evidence an intent to create a domestic support obligation. I anticipated that would be something the Court would want me to address. You have to speak up. I can't hear you. I anticipated that would be an important question and I'd like to address that. That's the case that binds us. So you tell me what are the four factors of Sternberg, what's the evidence in this case, why they don't fit, why this case is distinguishable, and why we shouldn't follow Sternberg. If I might, Your Honor, I believe that in my research, one of the reasons that the Court can consider the Sternberg decision without an end bank panel, because that was something I was a bit surprised when I received word that we would have oral argument. I thought, well, this is a case that's going to have to go in bank until it dawned on me that there's been a 900-pound gorilla in the room the whole time so long that I don't see it any longer. I'm not following you, sir. If I can explain. Tell us what the gorilla is. What it is is that we have had a substantial legislative change which alters this landscape entirely. When Sternberg was written, the issue between 523 claim or not, I'm sorry, I shouldn't use bankruptcy code that loosely, 523A5 is a section of the code, 11 U.S.C. 523A5, one of the longest standing provisions of the bankruptcy code which makes non-dischargeable what was then called a support obligation. And in 1984, we created a new obligation which was called the 523A15 obligation, which is a marital obligation. They're distinguishable because they both come out of the marital relationship but one is for support and the other by definition cannot be in the nature of support. That was the landscape when the Sternberg decision was decided. But since then, we have had a major change in the laws. In 2005, Congress enacted what is called the Bankruptcy Abuse Prevention and Consumer Protection Act, understandably referred to as BAP CPA. BAP CPA elevated for the first time support obligations to a priority status so high that they elevated it above the IRS which had held that position for many years. So now suddenly, when you characterize a debt as being support, the new term being domestic support obligation which is now found in a definition provided in the same code in Section 101, Subsection 14A, that is intended to create a more uniform nationwide standard for the treatment of domestic support obligations. Under these circumstances with the characterization of this claim becoming one of domestic support, for the first time, it now has priority status. It becomes paid ahead of all other creditors. This did not exist with Sternberg. Sternberg limited itself to a two-party dispute. By giving it this preferential status, we have taken a two-party dispute and turned it into one that affects all parties to the proceeding. So I would respectfully submit that Your Honors have the power to reexamine the rule that says that you never look beyond the intent of the parties and that you have the power to say that the support obligation must not only be one that was intended to be a support obligation, but at least in the unique context of a Chapter 13, it must be continuing to serve that support obligation. Wait a minute. But before 2005, if it was a marital obligation under the 1984 Act, it got preference for the spouse, and the other creditors simply were not able to prevail, right? Under the law prior to 2005, both the 523A5 support obligation and the 523A15 marital obligation were not given priority status, and therefore it was a question of dischargeability, a two-party dispute. But with the enactment of BAP CPA, they elevated the domestic support obligation, a newly coined term, to the highest priority status to ensure it would be paid ahead of all other claims at the expense of those other claims. Uniquely, they also changed the law. But why does that change the water on the beans as far as looking at the expressed intent of the contracting parties? Well, that is where, as I have made, set forth in the brief, that we are advocating that the Court consider the rule that has been raised in the Sixth Circuit. Is that the Fifth or the Sixth? In the Sixth Circuit, the rule is the differing rule, and it's escaping me at the very moment, the, not Sternberg. Calhoun? I'm sorry. I'm running off. Calhoun, Calhoun. I'm sorry, Your Honor. The Calhoun case is the one, and ironically, this case rose within, this case, actually the family law case was within the Sixth Circuit. And in the Sixth Circuit, Calhoun has said that not, the inquiry, it must first be intended to be support, but that doesn't end the inquiry. It must continue to be functioning as support. It must function as support. Yes. And in this case, Mrs. and Mr. Ergot have mutual obligations of support to sustain one another, but when Mr. Ergot undertake, undertook that obligation to the claimant in this case, he became the person who is obligated to support his wife, not her former husband any longer. Now, the parties contracted around that. That's undisputed. But the fact that the parties contracted around it to make this debt continue to be paid, notwithstanding the absence of any support, is exactly why the Court can look at it and say, this is not truly a support obligation. And whether it is support, it's not a question of Tennessee law. It is a question of federal law. We cited ample authorities for the basic proposition that this Court must- Your proposition is that Mr. Ergot, by marrying Mrs. Ergot, became liable for her support. Okay. Why can't she have a right of support from two people? It's a novel concept. It's actually been advanced by the National Organization of Women, saying that need should not be based upon the status of your husband. But again, I would look to the very testimony quoted in this brief. Mrs. Ergot took an awfully low opinion of herself because she stated in her testimony that because she had contracted herpes simplex 1, which is actually a very common illness. It's treatable with over-the-counter ointments, usually a sore on a lip. But she still described herself as damaged goods who would no longer attract a man of the means of my client. And therefore, when having to reenter the pool of eligible women as a less desirable potential candidate, she would need something to make her more attractive. And she perceived having a stream of money would serve that function. Now I would respectfully submit that, at least in accordance with our values traditionally, we do not believe that any man or woman should be supporting a former spouse who has remarried. It seems to run contrary to the principle that you look to your spouse for mutual support. And to continue to compel Mr. Ashworth to pay support under these circumstances seems unjust. But what makes it unjust, even more so, is that those payments are coming at the expense of creditors. Did Mr. Ashworth get to deduct his alimony payments from his income for all those years? It's a small consolation, but that is true. Small consolation? Isn't that a consideration in the negotiation? It shifted to her the burden of reporting this as income, but those funds are eventually taxed. It depends on whose rate is applied to them. I realize I only have 30 seconds. The difficulty seems to me, and I expect that your argument to take an entirely different tack. When these parties enter into an agreement, and they did enter into an agreement, there's just no doubt about it on this record, they were not equally situated. One party was in a stronger position than the other. One party was represented by counsel. The other was not. Isn't that pretty much this record? No, Your Honor. Both parties were represented by counsel. However, in the beginning and continuously. And in the beginning, Ms. Ergot also was represented by the same counsel who brought the $10 million tort claim against my client, as well as representing her in the divorce proceeding. I would submit that both parties were fairly well represented, at least had equal strength. Yeah, I had assumed the husband was not represented because of the nature of the agreement that was reached. But you tell me he was represented at the time. They were both represented, and I do not for one minute suggest that this is not an agreement that was binding between the two of them. But its impact has now deprived all other creditors of the estate because my client has paid less into this case in its five years. That $68,000 pales in comparison to the $90,000 you paid to her. You can make the argument, but that's not the primary concern. That's not. And I don't know that the Court's going to decide this case on that. On what basis would we decide that? Only on that on the ground that you just now mentioned. On the basis that the broader principle that would be sent out would be that in those situations where the parties are negotiating to conclude two claims, structuring it so as to maximize resources, as these parties did, and to make certain that in the event of a bankruptcy that those resources will never reach the other creditors, is manifestly unfest to the third-party creditors. And yet it is something that is a commonplace occurrence in the family law field. Because if you're going to settle a case— A decision that would reverse and follow the lines that you are urging us to follow. I would ask that the Court simply include only four provisions. And that they basically—the rationale is to look at the Calhoun decision, which says that the Court, in the case of Chapter 13, must look to the current function of that agreement, whether it's still meeting a support need, which I submit it has not in the case of a woman who has long been remarried. That the examination of it be limited to those cases where there has been more or less a global settlement melding together multiple diverse claims. That the burden would, of course, remain on the objecting party, my client, to show a lack of continuing need. And finally, I think that the Bankruptcy Court would be well within its powers to remand to the State Court, as appropriate, when appropriate, the determination of whether or not there exists a need. So that it's not needlessly dragged into the domestic relations field, which traditionally is hands-off with the federal judiciary. So I think there is a rule that could be formulated that would not necessarily have the effect of causing these courts to have to revisit again and again and again these support issues only when these unique facts are rated and only when it has not been litigated before the family court. I realize my time is up and I exceeded, but thank you very much. We took you there. We appreciate the argument. Good morning, Your Honors. Scott Talkov on behalf of the Appley Catherine Urgot. May it please the Court. Your Honors mentioned just a moment ago that this case represents the second bite at the apple. I would submit that this is actually the third bite at the apple. Mr. Ashworth's first bite was in Tennessee. He requested that the Court reduce his alimony based on the present needs. The Court denied that petition and instructed him not to return. Eighteen days later, Mr. Ashworth met with his current counsel and later filed a bankruptcy. He then went to the trial court and had a second bite at the apple, claiming that the intent of the parties was to create a property settlement related solely to the civil suit. That action was denied. On appeal, Mr. Ashworth is now looking for his third bite at the apple, an opportunity to- We rarely call appeal a second bite at the apple, but I hear what you're saying. He's actually- Same case. He's looking for the Calhoun to be applied, an argument that he never raised. And that's why I would refer to this as the third bite at the apple. Specifically, in Appellee's brief on page 6, footnote 2, I provide the quotation from the appellant's objection to claim and trial brief. It states, the party's intentions cannot be altered by events that may have occurred subsequent to the time of their agreement. The Court and Inres Sternberg observed that in determining whether a debtor's obligation is the nature of support, the intent of the parties, the time of the settlement agreement is dispositive. Thus, the events and circumstances that may have occurred or risen subsequent to the execution of the settlement that might have altered the parties have no bearing. And that is why I refer to this as the third bite at the apple. He did not make this argument to the trial court. He did not suggest that Calhoun was the law. Instead, in Excerpts of Record page 123, Appellant's counsel confirmed that it was an all-or-nothing case. He believed that the alimony was entirely a property settlement, and he did not prevail. The BAP at Supplemental Excerpts of Record E158 claims that he's making a new argument on appeal. There were a couple of questions, Your Honor, asked. With regard to BAP CPA, Appellant's counsel is referring to the fact that alimony is now of a higher level of support than it was prior. This is not a suggestion that the public is looking for courts to reduce the protection for support creditors. With regard to this argument that alimony is at the expense of unsecured creditors, on page 10, footnote 5, in Appellant's brief, I walked through the math, which shows that the appellant is actually attempting to accelerate his alimony, which would otherwise be payable over a lengthy period of time, into his five-year plan. In fact, the acceleration is meant to reduce the payment to unsecured creditors, not to maximize that payment. With regard to the civil lawsuit, Appellant is having trouble figuring out his argument with regard to the value of that lawsuit. On one hand, he said the argument was worthless, or the lawsuit was worthless, because everyone has herpes, and really it was totally worthless. Maybe it was worth the $1 that he settled on, and the rest truly is alimony, but then at other times he argues that he was so scared he must have settled for that. He can't keep his story straight because he's willing to say whatever he believes is required in order to reduce his alimony. And with regard to the counsel that were represented? I expect this record shows that the problem is the need of one and the ability of the other to pay. Normally, those are the questions, and normally that's why the matter isn't in the Federal court, it's in some family court or divorce court. But the courts look at the need of the one and the ability of the other to pay, and that's how you fix the amount of money that's to go from one to the other. When we look at it in this case, at this posture of this case, the need of one has lowered substantially, the ability of the other to pay has lowered substantially. Now, we may not get to that question at all because of the posture of the case. And when the agreement was made, I assumed because of the imbalance of the agreement that one side was not represented by counsel. Both sides were represented by counsel, agreement was made. It's been tried twice. I don't know the rationale that we would use to lower it, but you don't want to pretend that the problem now is not the need of the one and the ability of the other to pay. That's why this case is before us. Yes, Your Honor, on both of those points, Mr. Ashworth was represented by two attorneys in Tennessee. One was a civil attorney, one was a family law attorney, and Mr. Argot had one attorney. With regard to the ability to pay, Mr. Ashworth's income at the time he interned in the settlement was approximately $150,000 a year. And when he filed bankruptcy, he earned $262,000 per year. His ability to pay seemingly increased. And there is no evidence in the record with regard to Mr. Argot's needs, present needs at the time, because that wasn't the issue. I realize it may not be the issue today either, but that's what the normal posture of the case is. And we're not there now. Your Honor, do I have any other questions? If not, I will admit on the record. Apparently not. Thank you. Thank you, Your Honor. The case just argued is submitted. We thank both counsel for your helpful arguments. That concludes the argument calendar for today. We're adjourned.
judges: Farris, Clifton, Bea